

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF OREGON**

TRISH M. BROWN  
CHIEF JUDGE

1001 SW FIFTH AVENUE, #700  
PORTLAND, OREGON 97204  
(503) 326-1592

STEPHEN A. RAHER  
LAW CLERK

SUZANNE M. MARX  
JUDICIAL ASSISTANT

March 22, 2018

Douglas R. Ricks  
Vanden Bos & Chapman, LLP  
319 SW Washington St., Ste. 520  
Portland, OR  97204

Kenneth P. Childs  
Stoel Rives LLP  
760 SW Ninth Ave., Ste. 3000  
Portland, OR  97205

Brad T. Summers  
Lane Powell PC  
601 SW Second Ave., Ste. 2100  
Portland, OR  97204

**VIA CM/ECF ONLY**

Re:   *In re Frank F. Hartner*, Case No. 16-31394-tmb7

Dear Counsel:

On February 20, 2018, creditor Jennifer Hartner filed a timely motion (the "Motion," ECF No. 411) seeking various modifications of the opinion issued by the court on January 23, 2018 (the "Opinion," ECF No. 398). Having reviewed the transcript attached to the Motion, Ms. Hartner's memorandum of law (the "Hartner Memorandum," ECF No. 412), and the responses filed by trustee Kenneth Eiler and creditors Marcus and Matthew Fullard-Leo, I write today to deliver my ruling. For the reasons set forth below, I believe the findings and conclusions contained in the Opinion are correct, and I decline to grant the relief sought in the Motion.

**Background**
The parties are familiar with the facts of this dispute, which are set forth in detail in the Opinion. As relevant to this Motion, Jennifer Hartner filed a proof of claim in the above-captioned case (the "Claim," Claim No. 2-3), seeking payment of approximately $405,600, on account of a 1992 marital settlement agreement between herself and Debtor (the "MSA"). The Fullard-Leos filed an objection to the Claim (ECF No. 306); and, following an evidentiary hearing, the court issued its Opinion sustaining the Fullard-Leos' objection. On February 5, 2018, the court entered an order disallowing Ms. Hartner's Claim (ECF No. 401).

**Treatment of Refinancing Proceeds**
The MSA states that a payment is due to Ms. Hartner "[i]n the event Husband sells or refinances" the Subject Properties.[1] MSA ¶ 9(a)(iv). The court found evidence that the Subject Properties were both sold or refinanced more than six years prior to the Debtor's bankruptcy petition, and thus Ms. Hartner's Claim is time barred.[2] Opinion at 14-17.

In the Motion, Ms. Hartner argues that the refinancing transactions did not trigger a payment obligation because Debtor never received proceeds from these transactions, and thus there was never a breach of the MSA. Regardless of the merits of this theory, it clearly fails in the case of the Franz Property, because the refinancing was not the only event to trigger a breach-of-contract claim. As stated in the Opinion, the Franz Property was transferred from Ashley's, Inc. to El Nino, LLC contemporaneous with the May 1998 refinancing. Accordingly, even disregarding the refinancing loan, this 1998 transaction gave Ms. Hartner remedies that she did not pursue. Ms. Hartner argues that this was not a triggering event, because any breach caused by the conveyance was immaterial. Hartner Mem., at 8-11. As the Trustee correctly points out, the conveyance of the Franz Property was very much a material breach—the MSA awarded Ms. Hartner an unliquidated sum, to be measured (in part) by the value of "Husband's interest in Ashley's Inc." MSA ¶ 9(a)(i). By transferring the Franz Property from Ashley's, Inc. to another entity, Debtor was severely diminishing the value of the corporation, and thus impairing the value of Ms. Hartner's potential recovery under the MSA. Furthermore, the transfer constituted a breach of Debtor's duty to maintain the corporate assets of Ashley's, Inc. *See* MSA ¶ 9(b).

The Ashley's Village Property is a closer call, because there does not appear to have been a sale of that property. Instead, the Fullard-Leos argue that Debtor's payment obligation was triggered by a refinancing loan. Consistent with this theory, Debtor testified that Can-American, Inc. (the owner of the property) obtained a loan in July 2003 for the purpose of refinancing the Ashley's Village Property. Trial Trans. (Motion, Exh. A), at 35-36. Debtor testified further that he did not personally receive any of the proceeds from the refinancing loan. *Id.* at 41:11-15. It is this fact upon which Ms. Hartner focuses in her Motion. The disposition of the loan proceeds is relevant because the MSA provides that, "In the event Husband sells or refinances any asset listed on Exhibit 1, Wife shall receive 50% of Husband's share of the net proceeds if the parties have not yet reduced Husband's obligation to a judgment." MSA ¶ 9(a)(iv). Ms. Hartner asks the court to read the foregoing phrase as requiring payment of half of the proceeds *personally received* by Debtor. This is a plausible interpretation, but it is not the best interpretation. The phrase "Husband's share of the net proceeds" could also mean the proportion of loan proceeds received by Can-American that corresponds to Debtor's percentage ownership of the corporation. *See* Fullard-Leo Resp. (ECF No. 416), at 4-5. I conclude that the latter interpretation is preferred, for two reasons.

First, the language from paragraph 9(a)(iv), read literally, sets forth a legal impossibility. Specifically, the MSA states that payment is due if "*Husband* [Debtor] sells or refinances" the Ashley's Village Property. But Debtor was not the owner of the property. In addition, if Can-

---

[1] To the extent a capitalized term is not defined in this ruling, it is given the meaning ascribed to it in the Opinion.
[2] Six years is the relevant measurement of time under Oregon's limitations period for contract claims. *See* Opinion at 16.

American (the actual owner) sold the property, then all net proceeds would be the property of Can-American, not Debtor. Accordingly, the only way in which Debtor could possibly obtain sales proceeds was if Can-American sold the property, received the proceeds, and then distributed funds to Debtor—but by that point, the money in Debtor's hands would have lost its character as sales proceeds, and would most likely be dividends or compensation. Thus, under Ms. Hartner's preferred interpretation, Debtor's payment obligation as set forth in paragraph 9(a)(iv) would be entirely illusory. On the other hand, under the Fullard-Leo's interpretation, if a refinancing loan yielded any net proceeds to Can-American, a certain percentage of those proceeds would be allocated to Debtor, in proportion with his ownership interest, and he would be liable to pay half that amount to Ms. Hartner. Because the purpose of paragraph 9 of the MSA was to provide compensation to Ms. Hartner, the court must prefer the interpretation that would most reasonably give Ms. Hartner the ability to compel payment. Accordingly, the Fullard-Leos' interpretation is the most reasonable. *See Indoor Billboard Northwest v. M2 Sys. Corp.*, 922 F.Supp.2d 1154, 1161 (D. Or. 2013) (when interpreting contracts, "[p]reference must be given to reasonable interpretations as opposed to those that are unreasonable, or that would make the contract illusory." (quoting *Shakey's Inc. v. Covalt*, 704 F.2d 426, 434 (9th Cir. 1983) (internal quotation marks omitted)).

The second reason that the Fullard-Leos' interpretation is preferable is that it conforms with the reality of how Debtor viewed the various business entities that he controlled. As a highly illustrative example: the sole member of El Nino, LLC is (or was) Ashley's, Inc., which in turn is owned equally by Debtor and his brother. Yet, when asked about the ownership of El Nino, Debtor completely disregarded the existence of the two-tier structure and testified he and his brothers were the owners of the LLC. Trans. at 48:14-16. When pressed for clarification, Debtor stated that "Ashley's, Inc. is Billy and I, one in the same." *Id.* at 43:18-19. This testimony—along with the blurring of corporate identity that is baked into the language of the MSA—indicates that Debtor generally disregarded corporate formalities. It also supports an inference that Debtor held similar views regarding Can-American. With this relaxed approach to corporate formalities in mind, it is reasonable to read the MSA as minimizing (albeit not completely disregarding) the separate corporate identity of Can-American: clearly, Debtor and Ms. Hartner were both cognizant that there were other co-owners of the corporation and thus loan or sale proceeds could not be treated as belonging entirely to Debtor. Yet, whether Debtor's share of such proceeds where held by the corporation or by himself appears to have little practical relevance, given Debtor's style of management. Ms. Hartner's preferred reading of the MSA adheres to a strictly literal observation of separate corporate existence, but this does not comport with the reality of Debtor's treatment of his closely-held entities.

Having concluded that the MSA should be read to trigger Debtor's payment obligation upon Can-American's receipt of sales or loan proceeds, there is an additional factual issue: did Can-American actually receive net proceeds as a result of the July 2003 transaction? This important question was not directly addressed at the evidentiary hearing. In fact, the only relevant evidence is a promissory note and trust deed indicating that Can-American received $935,000 from Homestreet Bank in July of 2003. Tr. Exhs. G and H. But it is not clear whether this entire amount was used to pay off the existing encumbrance, or whether there were net proceeds left for the borrower. Debtor clearly testified that *other* refinance loans yielded net proceeds that

were used for various purposes (Trans. at 21:7-16, 26:10-13, and 33:10-14), but he did not testify one way or the other concerning the 2003 Homestreet loan.

In the absence of evidence directly on point, I decline to modify the court's prior ruling because Ms. Hartner has failed to carry her burden of persuasion. Once Ms. Hartner filed her amended proof of claim that included supporting documentation (Claim No. 2-2), it was presumed to be valid pursuant to Federal Rule of Bankruptcy Procedure 3001(f). It was incumbent on the objecting parties to overcome this presumption by producing "evidence tending to defeat the claim that is of a probative force equal to that of the creditor's proof of claim." *Ashford v. Consol. Pioneer Mortg. (In re Consol. Pioneer Mortg.)*, 178 B.R. 222, 226 (9th Cir. BAP 1995) (quoting *In re Simmons*, 765 F.2d 547, 552 (5th Cir. 1985) (internal quotation marks omitted)). The objecting parties carried this burden by—among other things—providing evidence of transfers and refinancing loans that occurred after the execution of the MSA. Once this evidence was received, "the burden revert[ed] to the claimant to prove the validity of the claim by a preponderance of the evidence. The burden of persuasion is always on the claimant." *Id.* (quoting *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173-174 (3d Cir. 1992) (internal quotation marks omitted)). Accordingly, once the Fullard-Leos introduced evidence of the 2003 refinancing of the Ashley's Village Property, it was Ms. Hartner's burden to prove that this transaction yielded no net proceeds. She did not carry this burden, and therefore the court will not amend the Opinion.

### Ms. Hartner's Theory of *Pritchard* is Unpersuasive

As an alternative argument, Ms. Hartner asserts that she has non-time-barred claims under *Pritchard v. Regence Bluecross Blueshield of Ore.*, 225 Or. App. 455 (2009). *See* Hartner Mem. at 11-14. This argument lacks merit, as *Pritchard* is easily distinguishable. The plaintiff in *Pritchard* was the holder of a health insurance policy. In dispute was the timeliness of a breach-of-contract claim based on coverage of prescription drugs. The Oregon Court of Appeals held that each time plaintiff filled a prescription and the defendant denied proper coverage, a separate breach-of-contract claim accrued.

In this case, Debtor's finite obligations under the MSA are quite different from the open-ended obligations of an insurer under a health insurance policy. Debtor was obligated under the MSA to pay Ms. Hartner an unliquidated sum based on the values of two separate assets. When the Corporate Entities sold or refinanced these assets, Debtor's duty to make a payment came due under the terms of the MSA. When Ms. Hartner failed to timely bring a breach of contract claim, she relinquished her right to enforce Debtor's payment obligations under the MSA. Accordingly, it does not appear to the court that it mistakenly applied *Pritchard* to the facts of this case.

### Conclusion

Both the Motion and the accompanying memorandum of law state that the relief requested by Ms. Hartner is available under three procedural provisions. First, under Federal Rule of Civil Procedure 52(b) (applicable via Federal Rules of Bankruptcy Procedure 9014(c) and 7052), Ms. Hartner seeks amended findings of fact. However, Ms. Hartner does not point to any material facts that were omitted from the court's Opinion. Rather, she advocates for a legal theory based

on her preferred interpretation of the MSA. This does not warrant amended findings under Rule 52(b), and therefore such relief is denied.

Second, Ms. Hartner seeks relief under Federal Rules of Civil Procedure 59 and 60 (applicable via Federal Rules of Bankruptcy Procedure 9023 and 9024). Both of these rules are designed to correct manifest errors that have caused substantial harm to the losing party. Although Ms. Hartner has plainly explained her disagreement with the Opinion, the Motion does not point to any circumstances that would justify the extraordinary relief available under Rules 59 and 60.

For the reasons set forth herein, the Motion is denied. Counsel for the Fullard-Leos should submit an order denying the Motion within seven days of this ruling.

Very truly yours,

Trish M. Brown